UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- x
T.W.,

                Plaintiff,

      - against -

NEW YORK STATE BOARD OF LAW
EXAMINERS; JOHN J. MCALARY;
DIANE BOSSE; BRYAN WILLIAMS;
ROBERT MCMILLEN; E. LEO MILONAS;
and MICHAEL COLODNER,

                Defendants.
----------------------------------------------------------- x

**MEMORANDUM & ORDER**
16-cv-3029 (RJD) (RLM)

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★ SEP 26 2017 ★
BROOKLYN OFFICE

DEARIE, District Judge

      Plaintiff T.W. alleges that the New York State Board of Law Examiners ("the Board"), its chair, and individual members discriminated against her on the basis of a disability when they denied in large part her requests for accommodations for the July 2013 and July 2014 New York State Bar exams. Defendants move to dismiss arguing that T.W.'s claims are barred by New York's sovereign immunity under the Eleventh Amendment. After Defendants' motion was briefed, T.W. filed a motion requesting that certain filings containing her name be sealed and that the case caption be amended to reflect only her initials.

      Defendants' motion to dismiss is granted as to T.W.'s claims under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107, as well as her claims against the chair and members of the Board in their individual capacities. The Court defers ruling on Defendants' motion to dismiss T.W.'s claims under Title II of the ADA and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, until Plaintiff has an opportunity to conduct limited

discovery. T.W.'s motion to seal certain filings and amend the case caption is granted subject to the limitations outlined below.

## BACKGROUND

T.W.'s allegations stem from the Board's denial of three requested accommodations—(1) 50 percent extra time, (2) off-the-clock breaks, and (3) a separate testing room—during two unsuccessful attempts to pass the New York Bar. Although T.W. ultimately passed the exam in February 2015, she alleges that the Board's denials of accommodations derailed her nascent legal career, caused her to lose a lucrative job as a law firm associate, and continue to undermine her job prospects.

T.W. first took the New York Bar State exam in July 2013, shortly after graduating from Harvard Law School and before starting as an associate in the transactional practice at an international law firm. As a student, T.W. requested and Harvard provided accommodations for her depression, anxiety, and panic attacks, as well as deficits in short-term memory and "solving of complex abstract problems" caused by a 2009 injury. See ECF No. 1 ("Compl."), ¶ 25. When she applied for the exam, T.W. requested the same accommodations Harvard had granted: 50 percent extra time, off-the-clock breaks, and a separate testing room. In the alternative to 50 percent extra time and breaks, T.W. asked for 100 percent extra time.

At first, the Board rejected T.W.'s request in its entirety. After she appealed that determination and submitted additional documentation, however, the Board agreed to provide T.W. with off-the-clock breaks and seating in a smaller (but not private) room. The Board denied her request for extra time.

T.W. did not pass the July 2013 exam. By the time she received the news, T.W. had started her job at the law firm. She alleges that failing the exam had a negative impact on how

2

she was perceived at the firm, and that she was forced to take a leave from the firm to study for the July 2014 exam. When she applied for the July 2014 exam, T.W. again requested the same accommodations she had sought in 2013 and received at Harvard: 50 percent extra time, off-the-clock breaks, and a separate testing room. This time, the Board granted her 50 percent extra time and seating in a smaller room, but refused to give T.W. the off-the-clock breaks she had received the first time she took the exam. Again T.W. sat for the Exam, and again she did not pass. Having failed the exam twice, the law firm terminated her employment. She alleges that she has been unable to obtain comparable employment since.

After her termination but before leaving the firm, T.W. took and passed the February 2015 New York State Bar exam. As with her prior two attempts, T.W. requested 50 percent extra time, off-the-clock breaks, and a separate testing room. This time, however, the Board simply provided T.W. with double time.

T.W. brought suit against the Board, its chair, and members alleging violations of the ADA, Rehabilitation Act, and NYCHRL.

## DISCUSSION

A. <u>Motion to Dismiss</u>

Defendants argue that T.W.'s claims should be dismissed because they are barred by New York's sovereign immunity under the Eleventh Amendment. As a preliminary matter, the Court notes that T.W. has agreed to withdraw her claims under Title III of the ADA and the NYCHRL, and her individual capacity claims against the chair and members of the Board. These claims are dismissed, leaving only her allegations under Title II of the ADA and Section 504 of the Rehabilitation Act.

3

Although the text of the Eleventh Amendment guarantees states immunity from suit by "citizens of another state, or by citizens or subjects of any foreign state," its "ultimate guarantee . . . is that nonconsenting [s]tates may not be sued by private individuals in federal court," regardless of their citizenship. U.S. Const. am. XI; Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001). This guarantee is not absolute, however, and "Congress may abrogate the 'immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority.'" Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn, 280 F.3d 98, 108 (2d Cir. 2001) (alterations omitted) (quoting Garrett, 531 U.S. at 363).

In Defendants' view, neither Title II of the ADA nor Section 504 of the Rehabilitation Act abrogate New York's sovereign immunity from T.W.'s claims. Although provisions of both the ADA and the Rehabilitation Act explicitly state that they abrogate state sovereign immunity, those provisions rest on two separate grants of constitutional authority. Accordingly, two distinct analyses are required to determine whether either or both statutes have, in fact, effectively abrogated New York's sovereign immunity with respect to T.W.'s claims.

Title II of the ADA was enacted pursuant to Congress's powers under the Commerce Clause and Section 5 of the Fourteenth Amendment, see 42 U.S.C. § 12101(b)(4), and the statute explicitly states that it abrogates state sovereign immunity. See 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter."). Although Congress may, of course, validly enact statutes under its Commerce Clause authority, it may not abrogate the states' Eleventh Amendment immunity thereunder. See Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 72-73 (1996). This is true because "[t]he Eleventh Amendment restricts the judicial power under Article III, and Article I [provisions, like the commerce clause,]

4

cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction." Id. The Eleventh Amendment, however, "'and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment.'" Garrett, 531 U.S. at 364 (quoting Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976)). The question, thus, is whether Congress validly abrogated state sovereign immunity in Title II by using its remedial powers under Section 5 of the Fourteenth Amendment. See id.

Section 5 of the Fourteenth Amendment gives Congress "the authority both to remedy and to deter violation of rights guaranteed [by the Fourteenth Amendment] by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 81 (2000). Congress's Section 5 authority, broad as it may be, is not unlimited, and in order to be valid, legislation enacted thereunder must exhibit "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." City of Boerne v. Flores, 521 U.S. 507, 520 (1997); see also Garrett, 531 U.S. at 365-73 (applying a three-part test to determine whether Title I of the ADA was congruent and proportional and thus valid Section 5 legislation).

Unlike Title II of the ADA, Section 504 of the Rehabilitation Act requires that states consent to suit (i.e. waive their sovereign immunity) as a condition of receiving certain federal funds. See 42 U.S.C. § 2000d-7 ("A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 . . . ."). "When providing funds from the federal purse, Congress may require as a condition of accepting those funds that a state agree to waive its sovereign immunity from suit in federal court." Garcia, 280 F.3d at 113 (citing Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 686-87 (1999)). A state's

5

acceptance of federal funding does not, however, affect a wholesale waiver of its sovereign immunity. Rather, Section 504 "applies only to those government agencies or departments that accept federal funds, and only those periods during which the funds are accepted." Id. at 113 n.2 (citing Jim C. v. United States, 235 F.3d 1079, 1081 (8th Cir. 2000) (en banc)).

T.W.'s claims are therefore barred unless: (1) Title II of the ADA is a valid exercise of Congress's authority under Section 5 of the Fourteenth Amendment, or (2) the New York State Board of Law Examiners consented to suit under Section 504 of the Rehabilitation Act by accepting federal funds. Importantly, because the same legal standards and remedies apply to claims under Title II of the ADA and the Rehabilitation Act, T.W. need prevail on just one of these two grounds for her claims to survive Defendants' motion to dismiss. See Dean v. Univ. at Buffalo Sch. of Medicine & Biomed. Scis., 804 F.3d 178, 187 (2d Cir. 2015) (citing Harris v. Mills, 572 F.3d 66, 73-74 (2d Cir. 2009)); Ross v. City Univ. of N.Y., 211 F. Supp. 3d 518, 528 (E.D.N.Y. 2016) ("[T]he remedies available to plaintiff under Title II of the ADA and the Rehabilitation Act are identical.").

With respect to Section 504 of the Rehabilitation Act, T.W. alleges that the Board has consented to suit, and thus waived its sovereign immunity, by receiving federal funds. As she points out, the Second Circuit previously reached the same conclusion with respect to the Board which, at least in the past, received federal funds through a voucher program with two other state agencies. See Bartlett v. N.Y. State Bd. of Law Examiners, 156 F.3d 321, 330 (2d Cir. 1998), vacated on other grounds, 527 U.S. 1031 (1999). T.W. suggests that the Board continues to receive federal funding through New York's unified court system, of which it is a part, and through a voucher program for veterans who take the bar exam. See ECF No. 22-1 (attaching screenshots from the United States Department of Veterans Affairs website that T.W. argues

6

describe a voucher program by which the federal government provides funds to defray the costs of veterans taking the bar exam).

Defendants dispute these allegations, attaching a declaration from the Board's Executive Director, Defendant John J. McAlary. See ECF No. 17 ("McAlary Decl."). In it, McAlary states that the Board is funded "solely by a special revenue fund called the Attorney Licensing Fund," made up of registration fees paid by attorneys licensed in New York, and that the Board "has not received any federal funding from January 2013 through the present." Id. at ¶¶ 3-4. Defendants also assert that the voucher program for veterans cited by T.W. is, in fact, a direct reimbursement of the registration fee for the bar exam by the federal government to individual veterans, with no direct provision of funds from the federal government to the Board. As a result, Defendants conclude that the Board retains its sovereign immunity.

Because these facts are disputed and the question of "[w]hether or not . . . [the Board] receives federal funding is a fact peculiarly within the possession and control of . . . defendants," T.W. is entitled to limited discovery regarding the Board's possible waiver of its sovereign immunity. Cohn v. KeySpan Corp., 713 F. Supp. 2d 143, 159 (E.D.N.Y. 2010) (citing Arista Records, LLC v. Doe 3, 604 F.3d 110, 119 (2d Cir. 2010)). If, after discovery, the evidence shows that the Board did accept federal funds during the relevant period, then in all likelihood it will not be necessary to reach the question of whether Title II of the ADA is a valid exercise of Congress's authority under Section 5 of the Fourteenth Amendment.[1] See Ross, 211 F. Supp. 3d at 528 (declining to reach the same question at the pleading stage based in part on the

---

[1] The same is true of Defendants' argument that T.W.'s declaratory and injunctive relief claims against the chair and members of the Board fall outside the Ex parte Young, 209 U.S. 123 (1908) exception to state sovereign immunity. The Court will address that argument, if necessary, after limited discovery is complete.

7

"'fundamental and longstanding principle of judicial restraint [that] requires courts avoid reaching constitutional questions in advance of the necessity of deciding them.'" (quoting Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 445-46 (1988))).

B. Motion to Amend the Case Caption and to Seal

The Court now turns to T.W.'s motion to amend the case caption and to seal various filings.

After briefing on this motion was completed, and likely prompted by an inquiry from the Court, counsel for Plaintiff filed a letter application stating that "[i]n the interests of justice and to protect confidential medical information, Plaintiff hereby requests that filings containing the full name of Plaintiff in [this case] be sealed and . . . the matter proceed using only the Plaintiff's initials . . . ." ECF No. 30 ("Sealing Mot."), at 1. For reasons of his own, the State Attorney General has chosen to oppose this understandable, albeit tardy application, arguing that under the Second Circuit's decision in Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185 (2d Cir. 2008), the Court should keep all filings public and proceed using T.W.'s full name.

In Sealed Plaintiff, the Second Circuit enumerated a list of ten non-exhaustive factors that district courts should take into account in balancing "the plaintiff's interest in anonymity . . . against both the public interest in disclosure and any prejudice to the defendant." Id. at 189. These factors are:

> (1) [W]hether the litigation involves matters that are highly sensitive and of a personal nature, (2) whether identification poses a risk of retaliatory physical or mental harm to the party seeking to proceed anonymously or even more critically, to innocent non-parties, (3) whether identification presents other harms and the likely severity of those harms, including whether the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity, (4) whether the plaintiff is particularly vulnerable to the possible harms of disclosure, particularly in light of [her] age, (5) whether the suit is challenging the actions of the government or that of private

8

>parties, (6) whether the defendant is prejudiced by allowing the plaintiff to press [her] claims anonymously, whether the nature of that prejudice (if any) differs at any particular stage of the litigation, and whether any prejudice can be mitigated by the district court, (7) whether the plaintiff's identity has thus far been kept confidential, (8) whether the public's interest in the litigation is furthered by requiring the plaintiff to disclose [her] identity, (9) whether, because of the purely legal nature of the issues presented or otherwise, there is an atypically weak public interest in knowing the litigants' identities, and (10) whether there are any alternative mechanisms for protecting the confidentiality of the plaintiff.

Id. at 190 (internal citations, quotation marks, and alterations omitted).

Weighing these factors and conscious as ever of the public interests at play, the Court finds that amending the caption to use Plaintiff's initials is appropriate. The complaint details T.W.'s medical history, including depression, anxiety, panic attacks, and cognitive impairments; and alleges continuing reputational and psychological harm stemming from Defendants' alleged failure to provide necessary accommodations for these conditions during the bar exam. Although T.W.'s medical conditions are not necessarily uncommon, these alleged concerns are meaningful and are not counterbalanced by any prejudice to Defendants if the case proceeds under a pseudonym. See id. at 190 (stating the relevance of prejudice to defendants and "whether the suit is challenging the actions of the government . . ." in balancing the relevant interests); see also Doe v. Frank, 951 F.2d 320, 323 (11th Cir. 1992) (noting that it is more important to proceed under a party's true name in suits against private parties than in those against the government). Defendants are right, of course, that to date this case has been litigated under T.W.'s full name, but this is just one factor of many the Court must consider, and not conclusive. See id. at 190 (stating that "whether the plaintiff's identity has thus far been kept confidential" is one of the factors courts must consider in balancing the public and private interests at play); but see Doe v. Nat'l Conference of Bar Examiners, No. 16-CV-264 (PKC),

2017 WL 74715, at *3 (E.D.N.Y. Jan. 6, 2017) (concluding that a similar request based on the possibility of retaliation by defendants was "belied by the fact that [plaintiff] has already publicly disclosed her identity during the course of this litigation.").

The Court declines, however, to order the blanket sealing of documents T.W. requests, including the complaint. To protect the public interest in access to court documents and filings, the Court directs the clerk to amend the caption and other docket entries to reflect Plaintiff's initials and to temporarily seal the complaint and briefing on the motion to dismiss to allow the parties to propose limited redactions to protect the personal privacy of Plaintiff. See Richmond Newspapers v. Virginia, 448 U.S. 555, 576-77 (1980) (discussing the First Amendment implications of sealing court proceedings). Despite the Board's opposition, the Court expects that the parties will meet and confer in an effort to agree on such redactions, sensitive to the concerns of the Court and Plaintiff.

## CONCLUSION

Defendants' motion to dismiss is granted in part. The Court dismisses T.W.'s claims under Title III of the ADA and the NYCHRL, and her individual capacity claims against the chair and members of the Board. The Court defers ruling on the application of Defendants' sovereign immunity defense to T.W.'s claims under Title II of the ADA and Section 504 of the Rehabilitation Act until T.W. has an opportunity to conduct limited discovery into the Board's possible waiver of its sovereign immunity under the Rehabilitation Act.

**SO ORDERED.**

Dated: Brooklyn, New York
September 25, 2017

s/Raymond Dearie
RAYMOND J. DEARIE
United States District Judge

10