## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| _____ | ) | |
| ██████████████ | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 1:16-cv-3029 |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| NEW YORK STATE BOARD | ) | JURY TRIAL DEMANDED |
| OF LAW EXAMINERS; JOHN J. MCALARY, | ) | |
| as Executive Director, New York State Board of | ) | |
| Law Examiners; DIANE BOSSE, Individually and | ) | |
| as Chair, New York State Board of Law Examiners; | ) | |
| BRYAN WILLIAMS, Individually and as Member, | ) | |
| New York State Board of Law Examiners; | ) | |
| ROBERT MCMILLEN, Individually and as | ) | |
| Member, New York State Board of Law Examiners; | ) | |
| E. LEO MILONAS, Individually and as Member, | ) | |
| New York State Board of Law Examiners; | ) | |
| MICHAEL COLODNER, Individually and as | ) | |
| Member, New York State Board of Law Examiners, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

Plaintiff ████████ brings this Complaint against the New York State Board of Law

Examiners, its Executive Director, John J. McAlary, in his official capacity, and against Diane

Bosse, Bryan Williams, Robert McMillen, E. Leo Milonas, and Michael Colodner in their

official capacities as members of the Board and as individuals, and alleging discrimination based

on disability in violation of law.

### INTRODUCTION

1.     In the summer of 2013, ████████ thought she had achieved her dream of

becoming a top-flight lawyer. ████████ an African-American woman from a middle-class

family, had recently graduated from Harvard Law School and was about to begin her career at a

top law firm in New York City. To get that far, she overcame severe depression, anxiety, and a

head injury that left her with certain cognitive limitations. Harvard granted ████ common

accommodations, including accommodations on examinations, tailored to ensure that her

academic focus could be on her considerable abilities rather than her disabilities.

2.    When it came time to take the New York bar examination, ██████'s dream

turned into a nightmare. Although Harvard had granted ████ testing accommodations, and

although her doctors determined that she needed the same accommodations on the bar

examination, the New York State Board of Law Examiners refused to grant them. As a result,

she failed the bar examination on her first two attempts, only passing when the Board belatedly

granted her appropriate accommodations on her third attempt. By then, ████ had lost her

job because of the stigma attaching to bar examination failures. For similar reasons, she has not

been able to obtain a comparable position. Put simply, the Board's illegal decisions – the reasons

for which it never has adequately explained – have derailed a highly promising legal career.

3.    Accordingly, ██████ brings this action against the New York State Board of

Law Examiners, its Executive Director, and its Board Members to seek redress for its violation

of Title II and Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et

seq*.; Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794 *et seq*.; and the New

York City Human Rights Law, N.Y.C. Admin. Code §§ 8-102-16(a), 8-107(4). She seeks

compensatory damages for the harm the Defendants have inflicted and continue to inflict upon

her. She also seeks declaratory relief that will ensure that the Defendants properly understand

their obligations with respect to future applicants for accommodations, injunctive relief that will

clear the way for her to seek employment unfettered by Defendants' discriminatory conduct, and attorneys' fees and costs.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over Plaintiff's claims brought under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has supplemental jurisdiction over Plaintiff's claims brought under the New York City Human Rights Law pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in this District under 28 U.S.C. § 1391(b)(1)-(2) and (c)(2) because Plaintiff resides in this District and has suffered, and continues to suffer, consequences of Defendants' discriminatory actions in this District.

## PARTIES

6.      Plaintiff                    lives at 897 St. Johns Place, Brooklyn, N.Y.  She is a 2013 graduate of Harvard Law School.  As described more fully below, she is a qualified individual with a disability and so was entitled to accommodations pursuant to the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), and the New York City Human Rights Law.

7.      Defendant New York State Board of Law Examiners is an instrumentality of the State of New York, with its principal place of business in Albany, New York.  It administers the New York bar examination, a professional licensing examination that is required for admission to practice law in New York and therefore has the legal, educational, and professional responsibility to offer testing accommodations to individuals with disabilities who take the bar examination. The Board administers the bar examination at locations throughout New York State.

3

8. The Board is a recipient of Federal financial assistance for purposes of Section 504.

9. Defendant John J. McAlary is the Executive Director of the New York State Board of Law Examiners and is being sued in his official capacity.

10. Defendant Diane Bosse is the Chair of the New York State Board of Law Examiners and is sued in her official capacity as chair and member of the Board and as an individual.

11. Defendant Bryan Williams is a member of the New York State Board of Law Examiners and is sued in his official capacity as a member of the Board and as an individual.

12. Defendant Robert McMillen is a member of the New York State Board of Law Examiners and is sued in his official capacity as a member of the Board and as an individual.

13. Defendant E. Leo Milonas is a member of the New York State Board of Law Examiners and is sued in his official capacity as a member of the Board and as an individual.

14. Defendant Michael Colodner is a member of the New York State Board of Law Examiners and is sued in his official capacity as a member of the Board and as an individual.

## FACTUAL BACKGROUND

15. ▮▮▮▮▮▮▮ is 29 years old and resides in New York City.

16. ▮▮▮▮▮▮ was born and raised in Baltimore. She is the oldest of three children brought up in a middle-class, African-American family.

17. An academic overachiever, ▮▮▮▮▮ graduated from Bates College in 2008. That fall, at the age of 21, she entered Harvard Law School.

4

18.     Around that time, ███████ first began experiencing symptoms of depression and anxiety. These symptoms were compounded by her father's death from prostate cancer in June of 2008 and her maternal grandmother's death in October 2008.

19.     To recover from these setbacks, ███████ withdrew before the end of her first semester and took a leave of absence from Harvard for the 2008-2009 school year. She also received her first diagnoses of depression and anxiety.

20.     In July 2009, ███████ suffered a serious head injury when an all-terrain vehicle she was riding toppled off a cliff. She suffered amnesia for about a day and was hospitalized for a short period of time.  Following this injury, she began to experience short-term memory problems and other cognitive deficits.

21.     Between August 2009 and January 2010, ███████ suffered three more blows to the head, possibly as a result of lingering effects of her first head injury. Whatever the cause of those blows, ███████ was experiencing cognitive difficulties, difficulties in concentration, and amnesia. The worsening symptoms were terrifying and caused panic attacks and depression.

22.     ███████ returned to school and completed her first year at Harvard during the 2009-2010 school year. By the end of the school year, however, ███████'s symptoms had worsened.

23.     ███████ began her second year at Harvard in the fall of 2010 but quickly was forced to withdraw because of her worsening symptoms, which now included severe depression.

24.     She spent the remainder of the 2010-2011 academic year on leave and began therapy.

25.     While she was on leave, ████████ obtained a neuropsychological evaluation from Dr. Arthur M. Horton, Jr. Dr. Horton diagnosed her with certain deficits, including with respect to short-term memory and the solving of complex abstract problems.

26.     In preparation for her return to Harvard in the Fall of 2011, ████████ also began seeing Dr. Stephanie L. Pinder-Amaker, a psychologist who was the director of McLean Hospital's College Mental Health Program and an instructor in psychiatry at Harvard Medical School.

27.     Dr. Pinder-Amaker recommended, and Harvard provided, accommodations for ████████'s disabilities during her second year of law school.  Among other things, ████████ received on her examinations 50 percent extra time; stop-clock breaks during which time would not run; and a separate testing room.

28.     ████████ had her condition regularly monitored by a team of doctors and therapists led by Dr. Pinder-Amaker.  At Dr. Pinder-Amaker's recommendation, Harvard provided her with the same accommodations in her third year of law school.

29.     ████████ took medication during her second year of law school to help control her anxiety.  In Fall 2012, as she began her third year of law school, ████████ experienced medical complications from her anti-anxiety medication. No longer able to take that medication, she began having more frequent panic attacks that interfered with her classwork.  With the assistance of Dr. Pinder-Amaker, ████████ learned behavioral techniques to help manage her panic attacks. She also sought and obtained from Harvard targeted accommodations such as not being "cold-called" by professors.

Case 1:16-cv-03029-RJD-RLM Document 1 Filed 06/10/16 Page 7 of 20 PageID #: 7

30.     With the necessary accommodations, ███████ performed well at one of the top

law schools in the country, earning praise for her legal reasoning and analytical abilities as well

as for her interpersonal skills, her diligence, and her maturity.

31.     ███████ spent the summer of 2012 working for Ropes & Gray LLP, one of the

country's leading law firms, at its New York City office.  At the end of the summer, she received

and accepted an offer to become an associate at Ropes & Gray LLP upon her graduation.

Because she did not require any formally provided accommodations to work in the firm's

transactional practice and because she was under no obligation to disclose disability, she did not

disclose her disabilities to her employer.

32.     On April 29, 2013, ███████ submitted to the Board a completed application

for accommodations on the July 2013 bar examination.  She requested the three specific

accommodations that Harvard had given her: (1) 50% extra time; (2) stop-clock breaks; and (3) a

separate private testing room. If the Board could not combine 50% extra time and stop-clock

breaks, ███████ requested in the alternative that it give her 100% extra time.

33.     The accommodations ███████ requested are routinely provided by Defendants

and would not fundamentally alter the test.

34.     ███████ attached a letter from a Harvard Law School official documenting

that Harvard had determined these accommodations to be reasonable and necessary based on ███

███'s medical documentation and that she had received these accommodations consistently in

law school since the Fall of 2011.

35.     ███████ informed the Board that she had been diagnosed with four

impairments recognized by the DSM IV: panic disorder without agoraphobia, cognitive disorder,

reading disorder, and amnesic disorder.

36.    In the personal statement the Board requires of those applying for accommodations, ███████ explained why those impairments required the specific relief she requested.

37.    ███████ explained that she had difficulty concentrating for sustained periods of time, such as in the examination setting, and so the extra time was necessary to permit her the same opportunity to demonstrate her acknowledge as other test-takers.  Additionally, she told the Board, she suffered from debilitating panic attacks in such a stressful setting.  She explained that testing in a separate room would permit her to focus on the test and avoid anxiety caused by the presence of so many other test-takers, while stop-clock breaks would allow her to use breathing exercises and other techniques to decrease stress during panic attacks.

38.    ███████ attached Dr. Horton's 2011 report on her condition.

39.    ███████ also attached a letter from Dr. Pinder-Amaker dated April 24, 2013. Dr. Pinder-Amaker explained that she had coordinated ███████'s treatment and provided annual documentation to Harvard in support of ███████'s accommodations since October 2011. She stated that the deficits that Dr. Horton observed persisted and continued to slow ███████'s reading and comprehension, while ███████'s anxiety had worsened. Dr. Pinder-Amaker stated that ███████ satisfied the DSM IV criteria for the four disorders described on ███████'s application and that the accommodations she requested were appropriate.

40.    On June 12, 2013, the Board sent ███████ a letter, signed by Deputy Executive Director and Counsel Cara J. Brousseau, denying ███████ any accommodations based on its finding that ███████ did not have any disability. Ms. Brousseau stated that the Board's decision was based on the analysis of an unnamed "expert consultant with comprehensive

training and experience in a field related to your condition." She enclosed a four-paragraph "synopsis" of the consultant's report.

41.     This synopsis complained in a number of ways that the documentation ███ ███ provided was insufficient to enable the consultant to second-guess the medical determinations of Dr. Horton and Dr. Pinder-Amaker. For example, it complained that ███ ███ had not supported proof that she actually sustained a head injury.  It complained that Dr. Pinder-Amaker did not describe the extent to which she currently treated ██████ or walk through an analysis of how ██████ satisfied the DSM-IV criteria for the four diagnosed conditions.  It complained that there was no documentation of psychological tests administered since Dr. Horton's 2011 report.  It complained that Dr. Horton's report did not indicate which of the tests he performed "used age-based or grade-based norms."

42.      Substantively, the synopsis questioned Dr. Horton's conclusions.  It reasoned that Dr. Horton's finding that ██████ possesses superior intelligence and reading ability was inconsistent with his diagnosis of a reading disorder.  It also observed that ██████ made it through her first year at Harvard without accommodations.

43.     ██████ appealed the Board's decision. She included letters from both Dr. Horton and Dr. Pinder-Amaker. She also included a comprehensive, new evaluation from Dr. Rimma Danov, a neuropsychologist, which cost her approximately $4,000.

44.     In his sharply worded letter responding to the Board's "synopsis," Dr. Horton stated that he had "considerable concerns" regarding the synopsis, which "contains false statements and gross misunderstandings regarding neuropsychological evaluation," such that the consultant's expertise "must be questioned." For example, he observed, the consultant's complaint that Dr. Horton did not use age-based norms was "stupid," because ██████ was an

9

adult at the time. Moreover, Dr. Horton noted, much of the information that the consultant claimed to be missing from his original report—such as actual test scores—was, in fact, in that report.

45.     Dr. Pinder-Amaker's letter, meanwhile, provided additional information about her direct treatment of ██████ and about how ██████ met the DSM-IV criteria for panic disorder.

46.     Dr. Danov's letter confirmed the findings of Dr. Horton and Dr. Pinder-Amaker. Dr. Danov noted that, while ██████ had several "exceptionally well developed" abilities, such as reasoning and vocabulary, she had difficulty with sustaining focus, multitasking, and memorizing new information, "especially under a time pressure when she also becomes very anxious." Dr. Danov recommended that ██████ receive each of the accommodations she had requested.

47.     ██████ also gave the Board a deeply personal account of her panic attacks. She told the Board that, after receiving her denial letter, she attempted to study in a library full of other people in order to simulate test conditions. Within ten minutes, she told the Board, she had to leave because of a severe panic attack.

48.     On July 19, 2013, the Board issued a revised decision. It granted ██████ off-the-clock breaks and seating in a smaller room but with others receiving similar accommodations. It did not grant her 50 percent extra time. The Board gave no reason for denying this part of her request.

49.     On July 30 and July 31, 2013, ██████ took the New York bar examination. Because the Board did not grant her extra time or a separate room, ██████ could not complete large portions of the examination. During the examination she experienced multiple

10

panic attacks with significant symptoms including heart palpitations, trembling, dizziness, crying, sweating, and nausea. She attempted to control her symptoms with deep breathing exercises in the restroom. The stress of having inadequate time compounded her anxiety.

50.     On October 30, 2013, the Board informed ████████ that she had failed the bar examination. Her score was 611, 54 points short of the passing score of 665.

51.     Failing the bar examination was a major blow to ████████'s standing at Ropes & Gray LLP. She no longer was seen as one of the "star" young associates by the firm's partners, and she no longer received work directly from them. Moreover, just as her career was getting started, she was forced to schedule a significant period of leave time in order to study for the bar examination again, making it impossible for the firm to staff her on matters where she would have significant responsibility.

52.     ████████ signed up for the July 2014 bar examination.  She applied for the same accommodations that she knew she needed, her providers knew she needed, Harvard knew she needed, that had worked for her in the past and that she had sought the first time she took the bar. She attached the same, detailed materials from her doctors and from Harvard.  Additionally, she provided a personal statement attesting to her experience taking the bar examination with inadequate accommodations the first time.

53.     This time, the Board provided ████████ with 50 percent extra time and seating in a room with others.  It did not, however, provide her with the off-the-clock breaks it had given her the first time.  The Board provided no explanation for this decision.

54.     Again ████████ had no choice but to take the bar examination without the accommodations she needed. Again she experienced significant panic attacks compounded by

the stress of having been denied the necessary accommodations. During the examination she

experienced heart palpitations, tremors, sweating, dizziness, nausea, and crying.

55.     On October 28, 2014, the Board informed ███████ that she again had failed

the bar examination. This time, her score was 644, just 21 points short of passage.

56.     As a matter of policy, Ropes & Gray LLP – like many other law firms –

terminates all associates who fail the bar examination twice. Thus, just over a year after starting

at Ropes & Gray LLP, ███████ received notice that she would be terminated in February

2015.

57.     ███████ applied to take the next offered examination, in February 2015.  She

once again sought the same accommodations she had asked for each of the first two times

providing the same documentation she had provided and the Board had disregarded in the past.

The only additional information ███████ provided was the fact that she had failed the bar

examination twice without the needed accommodations.

58.     This time, the Board provided ███████ with double time instead of 50 percent

extra time. This was the accommodation she repeatedly had requested in the alternative should

the Board be unable to give her off-the-clock breaks along with 50 percent extra time. The Board

did not explain why its determination had changed.

59.     ███████ once again took the BarBri study course to prepare for the bar

examination.  This time, she had to pay the BarBri costs out of pocket.

60.     Having finally gotten the full accommodations that she had needed and had

requested three times, ███████ took and passed the February 2015 bar examination. The day

after taking that examination, she spent her last day on the Ropes & Gray LLP payroll. ███████

███████ was gratified to receive notice in April 2015 that she had passed, but her career already

12

had been damaged beyond repair by the Board's inexplicable failure to provide her with appropriate accommodations.

61.     ███████ has diligently pursued employment comparable to the position she held at Ropes & Gray LLP, but she has been unable to obtain such a position.

62.     Multiple top law firms have shown initial interest in her, as a Harvard Law School graduate who previously worked at Ropes & Gray LLP.  Upon interviewing her, however, they learn that she did not have the opportunity to gain the experience they seek from a 2013 graduate due to the disruptions caused by her bar examination failure.

63.     Moreover, just like Ropes & Gray LLP, other top law firms do not wish to employ someone who failed the bar examination twice. Indeed, ███████ has been told by multiple people involved in law firm hiring to tell potential employers she failed because she did not study enough rather than disclose that she sought and did not receive necessary accommodations.

64.     ███████ has been able to secure only temporary positions. None of them pay her anything resembling the $160,000 annual salary (plus excellent benefits and advancement potential) that she received at Ropes & Gray LLP much less the salary should would have been earning today absent the discrimination alleged. Nor do they provide her with the responsibility necessary to advance her career.

65.     As a result of Defendants' failure to adequately accommodate her disability, ███ ███ suffered, and continues to suffer, harm. These losses, caused by Defendants' conduct, include but are not limited to, actual monetary losses, future monetary losses, and other injuries including but not limited to humiliation, embarrassment, frustration, and denial of equal treatment and access.

13

66. ███████ lost employment with Ropes and Gray LLP, losing salary, benefits, earning potential, and career opportunity.

67. ███████ lost income as the result of time invested preparing for examinations she was forced to take without necessary accommodations.

68. ███████ lost funds in taking bar review courses and obtaining additional medical documentation.

69. Most important, ███████ lost her sense of self and accomplishment as she watched everything she had worked for slip from her grasp.

70. Defendants had no basis either for their initial determination that ███████ had no disability at all or for their subsequent refusals to grant her necessary accommodations to the full extent that she had received at Harvard and that her doctors recommended.

71. Defendants applied a fail-first requirement that devastated ███████ career and discriminated in violation of law, only granting the accommodations she needed after she had failed the examination twice without them.

72. Upon information and belief, Defendants maintain records documenting that ███ ███ failed the bar examination and Plaintiff has no official acknowledgement that the failures were the result of discriminatory test administration.

73. Absent expungement and/or official acknowledgement of discrimination, ███ ███ must disclose and struggle to explain failure on the bar examination in her job search despite such failures having been the result of discriminatory testing conditions.

74. Failure on two bar examinations has hindered and continues to hinder ███ ███'s ability to obtain employment insofar as it reflects poorly on her and has required her to disclose her disability to employers despite law that protects her from such disclosure.

14

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF—Violation of the Americans with Disabilities Act
(42 U.S.C. §§ 12101 *et seq.*)

75.     Plaintiff ████████ realleges and incorporates by reference paragraphs 1-74, as if fully set forth herein.

76.     ████████ is an individual with a disability. Her cognitive impairments, panic disorder, reading disorder, amnesic disorder, depression, and anxiety, constitute impairments that substantially limit the major life activities of learning, reading, concentrating, test-taking, and remembering.

77.     ██████ is a qualified individual with a disability because she was eligible to take and did take the bar examination offered by the Defendants.

78.     The Board is a public entity and state instrumentality subject to the non-discrimination requirements of Title II of the Americans with Disabilities Act.

79.     The Board administers a professional licensing examination and is therefore also required to comply with Title III of the Americans with Disabilities Act.

80.     Defendant Board members are charged with the obligation to ensure the Board does not discriminate on the basis of disability.

81.     Defendant Board members set policies and practices for the Board and review appeals including Plaintiff's appeal of the Board's denial of her request for accommodation.

82.     The statute and regulations prohibit discrimination on the basis of disability in professional licensing examinations.

83.     Section 309 of Title III provides that:

> Any person that offers examinations of courses related to applications, licensing, certification, or credentialing for secondary or post-secondary

education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals."

*See* 42 U.S.C. §12189.

84. The Board is the only entity that offers the New York bar examination, passage of which is a prerequisite for the practice of law in the State of New York.

85. As an entity that offers examinations related to professional licensing, certification, or credentialing, the Defendants are required to assure that the examination is administered so as to *best ensure* that the examination results for an individual with a disability accurately reflect the individual's aptitude, achievement level, or whatever other factor the examination purports to measure rather than reflecting the individual's disability.

86. Defendants' acts, policies, and practices discriminate against individuals with disabilities, including those who have mental and/or cognitive disabilities and require additional time, stop-clock breaks, and/or separate, quiet testing areas.

87. Defendants discriminated against ▮▮▮▮ on the basis of disability by denying necessary accommodations.

88. Defendants also discriminated against ▮▮▮▮ by requiring her to fail first before providing necessary accommodations. Such intentional fail first policies and practices permanently damage the career potential of students like ▮▮▮▮.

89. Defendants have failed to make reasonable modifications to its policies and practices to ensure that Plaintiff and others with disabilities do not face such discrimination because of their disabilities.

90. Defendants have failed to best ensure that ▮▮▮▮'s performance on the bar examination was representative of her abilities rather than her disabilities.

16

91.     ███████ lost her job as the result of Defendants' discrimination and must now

disclose and explain failure on the bar examination in her job search despite such failure being

directly the result of Defendants' denial of her rights.

92.     Declaratory and injunctive relief is necessary to clear the way for Plaintiff to

fairly obtain employment based on her skills.

**SECOND CLAIM FOR RELIEF—Violation of Section 504 of the Rehabilitation Act**
(29 U.S.C. § 794 *et seq.*)

93.     Plaintiff ███████ realleges and incorporates by reference paragraphs 1-92,

as if fully set forth herein.

94.     ███████ is an individual with a disability. Her cognitive impairments, panic

disorder, reading disorder, amnesic disorder, depression, and anxiety, constitute impairments that

substantially limit the major life activities of learning, reading, concentrating, test-taking, and

remembering.

95.     The Board is a recipient of federal Financial assistance.

96.     The Board's activities thus are subject to the anti-discrimination requirements of

Section 504 of the Rehabilitation Act.

97.     Defendants' acts, policies, and practices discriminate against individuals with

disabilities, including ███████, who require testing accommodations.  Because of her

disability, ███████ was deprived of an equal opportunity to access the bar examination.

98.     Defendants discriminated against ███████ solely on the basis of disability.

99.     Defendants' requirement that ███████ fail first before being afforded the

necessary accommodations discriminated against her with devastating consequences on her

career and potential and was intentional discrimination.

17

100.    Defendants' fail first policies and practices irrevocably harm students like ███████ ████ .

101.    Defendants have failed to make modifications to their policies and practices to best ensure that ███████ and others with disabilities do not face such discrimination because of their disabilities and that their examination results reflect their abilities, not their disabilities.

102.    Defendants maintain records of Plaintiff's performance under discriminatory conditions and such records hinder Plaintiffs' job search and career prospects.

**THIRD CLAIM FOR RELIEF—Violation of New York City Human Rights Law**
(N.Y.C. Admin. Code § 8)

103.    Plaintiff ███████ realleges and incorporates by reference paragraphs 1-102, as if fully set forth herein.

104.    Defendants offer the New York bar examination in New York City and make determinations about accommodations that will be provided and permitted for individuals with disabilities like ███████ .

105.    ███████ is an individual with a disability within the meaning of the New York City Human Rights law, N.Y.C. Code § 8-102 (16)(a).

106.    Defendants have intentionally discriminated against ███████ on the basis of her disability by denying her an equal opportunity to demonstrate her aptitude and achievement level on the bar examination and by failing to provide reasonable accommodations.

107.    Defendants' fail first policies and practices cause intentional and irrevocable harm to ███████ .

108.    Defendants continue to discriminate against ███████ insofar as the Defendants maintain official records of Plaintiff's examination results that were obtained under

18

discriminatory conditions and have taken no affirmative steps to undo the harm their conduct has caused.

109.    Defendants' failure to remediate its discrimination continues to compromise ████ ████'s efforts to obtain employment.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff ████████ prays that this Court grant the following relief:

a.    grant Plaintiff's request for declaratory relief, finding that Defendants' actions violated Title II and Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*.; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq*., and the New York City Human Rights Law, N.Y.C. Admin. Code § 8;

b.    enter a judgment for compensatory damages in favor of Plaintiff in an amount to be proven at trial before a jury that would fully compensate Plaintiff for the injuries alleged herein resulting from Defendants' conduct;

c.     enjoin Defendants from maintaining and reporting records of Plaintiff's examination results received under discriminatory conditions and require Defendants to take affirmative steps to alleviate the ongoing repercussions of the discriminatory test administration that continue to hamper Plaintiff's search for employment;

d.    award Plaintiff her reasonable attorneys' fees and costs; and

e.    grant such other relief as it deems just and equitable.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: _____, 2016

Respectfully submitted,


Jo Anne Simon (JS-2793)
Jo Anne Simon P.C.
356 Fulton Street, 3rd Floor
Brooklyn, N.Y. 11201
Phone: 718-852-3528
Fax:  718-875-5728
JoAnne@JoAnneSimon.com

*Counsel for Plaintiff*