UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- x
T.W.,
              Plaintiff,

    - against -                                **MEMORANDUM & ORDER**

NEW YORK STATE BOARD OF LAW          16-CV-3029 (RJD)(RLM)
EXAMINERS,
              Defendant.
---------------------------------------------------------- x
DEARIE, District Judge.

Plaintiff T.W. brings this lawsuit against the New York State Board of Law Examiners ("the Board") alleging that it discriminated against her by denying her certain accommodations for the July 2013 and July 2014 New York State bar exam, in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 et seq. Although T.W. ultimately passed the exam in February 2015, she alleges that the Board's decisions to deny her requests for accommodations were the reason she failed her first two tries, causing her to lose a lucrative job as a law firm associate and undermining her job prospects to date. Defendant moves to dismiss, arguing that the Court lacks subject matter jurisdiction because Plaintiff's claims are barred by sovereign immunity under the Eleventh Amendment. For the following reasons, Defendant's motion to dismiss is DENIED.

## DISCUSSION

Plaintiff alleges that Defendant's discriminatory conduct violates both Section 504 of the Rehabilitation Act and Title II of the ADA. Section 504 provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or

activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Defendant argues that these claims are barred because the Board, which is an entity of the State of New York, is immune from private suits by individuals in federal court. Although the Eleventh Amendment bars individuals from bringing suits against non-consenting states and its entities in federal court, U.S. Const. amend. XI, it is well established that Congress may pass laws that abrogate this immunity "when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority." Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn, 280 F.3d 98, 108 (2d Cir. 2001) (alterations omitted) (quoting Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001)).

In enacting the Rehabilitation Act, Congress clearly expressed its intent to abrogate states' Eleventh Amendment immunity for violations of Section 504, see 42 U.S.C. § 2000d-7 ("A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal Court for a violation of Section 504 of the Rehabilitation Act of 1973"), and it did so pursuant to its authority under the Spending Clause of Article I to "condition its grant of federal funds on states' taking certain actions that Congress could not require them to take." Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 686 (1999). Specifically, "the Rehabilitation Act requires states that accept federal funds to waive their sovereign immunity to suits brought in federal court for violations of Section 504." Jim C. v. United States, 235 F.3d 1079, 1081 (8th Cir. 2000). However, "as is the case with the waiver of any constitutional right, an effective waiver of sovereign immunity

2

requires an intentional relinquishment or abandonment of a known right or privilege." Garcia, 280 F.3d at 113. Therefore, since Section 504 "applies only to those government agencies or departments that accept federal funds, and only [for] those periods during which the funds are accepted," id., a state that accepts federal funds for a department or agency "waives its immunity only with regard to the individual [department or] agency that receives them." Jim C., 235 F.3d at 1081. Here, Plaintiff argues that New York has waived sovereign immunity against suits for the Board's violations of Section 504 because the Board is a unit of New York's Unified Court System ("UCS"), which itself receives federal funding, and because the Board indirectly receives federal funds that are disbursed to reimburse individuals for their bar exam and attorney registration fees.

With respect to Title II of the ADA, it is undisputed that Congress also expressly intended to abrogate states' Eleventh Amendment immunity. See 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter."). However, the parties dispute whether Title II was enacted pursuant to a valid grant of constitutional authority. In enacting Title II, Congress relied on its authority under the Commerce Clause and Section 5 of the Fourteenth Amendment. See 42 U.S.C. § 12101(b)(4) (invoking "the sweep of congressional authority, including the power to enforce the [F]ourteenth [A]mendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities."). However, Congress cannot base its abrogation of the states' Eleventh Amendment immunity upon its authority under the Commerce Clause. See Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 72-73 (1996) ("The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the

3

constitutional limitations placed upon federal jurisdiction."). On the other hand, Section 5 of the Fourteenth Amendment allows Congress to abrogate states' sovereign immunity by giving it "the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." Garrett, 531 U.S. at 364 (quoting Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 81 (2000)). Defendant nevertheless argues that Title II of the ADA is not a valid exercise of Congress' Section 5 abrogation power because there is no fundamental right to a professional license to practice law.

Because the same legal standards and remedies apply to claims under Title II of the ADA and the Rehabilitation Act, Plaintiff needs only prevail on one of these two claims to survive Defendant's motion to dismiss. See Dean v. Univ. at Buffalo Sch. of Medicine & Biomed. Scis., 804 F.3d 178, 187 (2d Cir. 2015); Ross v. City Univ. of N.Y., 211 F. Supp. 3d 518, 528 (E.D.N.Y. 2016) ("[T]he remedies available to plaintiff under Title II of the ADA and the Rehabilitation Act are identical."). Thus, if Plaintiff successfully demonstrates that sovereign immunity does not bar her Rehabilitation Act claim, the Court has subject matter jurisdiction over the action and does not need reach the constitutional question raised by her Title II claim. See Ross, 211 F. Supp. 3d at 528 (declining to reach the same question at the pleading stage based in part on the "'fundamental and longstanding principle of judicial restraint [that] requires courts [to] avoid reaching constitutional questions in advance of the necessity of deciding them.'" (quoting Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 445-46 (1988))).

I. Section 504 of the Rehabilitation Act

Section 504 prohibits discrimination on the basis of disability in any "program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The term "program or activity"

means, inter alia, "all of the operations of (1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government." 29 U.S.C. § 794(b). Thus, while a "[s]tate and its instrumentalities can avoid Section 504's waiver requirement on a piecemeal basis, by simply accepting federal funds for some departments and declining them for others," when a state accepts federal funds for a particular department or agency, it waives sovereign immunity for all the operations of that department or agency, "not merely those activities specifically supported by Section 504 funds." Jim C., 235 F.3d at 1081-82; see also Koslow v. Commonwealth of Pennsylvania, 302 F.3d 161, 171-72 (3d Cir. 2002) ("Although a particular activity… might be the state's only link to federal funds, the waiver under § 2000d–7 is structural. It applies to all the operations of the department or agency receiving federal funds."); Arbogast v. Kansas, Dep't of Labor, 789 F.3d 1174, 1185 (10th Cir. 2015) ("[A]cceptance of federal funds for one division within a larger department may effectuate a waiver of Eleventh Amendment immunity for the entirety of the larger department, including divisions that accept no federal funds.").

In essence, the parties' dispute over the Board's liability under the Rehabilitation Act centers on two issues: (i) whether the Board receives specifically earmarked federal financial assistance through third parties' reimbursement of bar exam and attorney registration fees, and (ii) whether the Board is an independent state agency or a "program or activity" of New York's Unified Court System, which both sides agree receives federal funds.

### a. The Board Only Benefits Economically from Federal Funds Used to Reimburse Bar Exam and Attorney Registration Fees

Section 504 liability may be imposed not only on entities that directly receive federal financial assistance, but also on entities to which federal financial assistance is extended indirectly or through another recipient. Bartlett v. NY State Bd. of Law Examn'rs, 156 F.3d 321, 330 (2d Cir. 1998). However, "entities that only benefit economically from federal assistance are not" subject to Section 504. NCAA v. Smith, 525 U.S. 459, 468 (1999) (explaining that the NCAA's receipt of dues from member-colleges that received federal funds at most "demonstrates that it indirectly benefits from the federal assistance afforded its members.").

Over twenty years ago, the Second Circuit found the Board was bound by the Rehabilitation Act because it allowed candidates with disabilities to pay their bar exam fees with vouchers provided by two New York state agencies that received federal funds. Bartlett, 156 F.3d at 320. Even though "there [was] nothing in the record to indicate that the Board ever actually elected to accept federal funds," the Court found it sufficient that the two state agencies "elected to receive federal funds and then extended that assistance to the Board in the form of vouchers for handicapped bar applicants." Id. In 2011, partly in response to the decision in Bartlett, the Board stopped accepting vouchers and changed its payment policies to permit candidates to pay their fees only by credit card, certified check or money order. However, the same two state agencies, now called Adult Career and Continuing Education Services-Vocational Rehabilitation ("ACCESS-VR") and New York State Commission for the Blind ("NYSCB"), as well as the U.S. Department of Veteran Affairs ("VA"), continue to use federal funds to reimburse candidates with disabilities and veterans for their bar exam and attorney registration fees, by having the candidates pay the Board directly and then submit proof of payment to the appropriate agency for reimbursement.

Plaintiff contends that despite the change in how the Board is paid by candidates, the decision in <u>Bartlett</u> still stands because the Board is still the intended recipient of federal funds. According to Plaintiff, it should be of no moment that individuals now pay the Board directly and then secure reimbursement because ACCESS-VR, NYSCB and the VA still specifically provide funds for such purpose. However, this argument ignores the fact that by changing its payment policies, the Board no longer actually receives any federal funds, it "only benefits economically from federal assistance." <u>NCAA</u>, 525 U.S. at 468.[1]

After <u>Bartlett</u>, in an effort to preserve its sovereign immunity, the Board chose to stop accepting the type of payment that caused the Second Circuit to conclude abrogated the Board's immunity. With the new payment system, the funds used to pay fees are not federal funds because the reimbursement policy is a closed loop between the funding agency and the applicant—the federal funds never make their way into the Board's bank accounts; they are paid, after the fact, to the candidates when they apply for reimbursement. When the Board accepts payment for its fees, it has no knowledge of whether any specific candidate will subsequently be reimbursed with federal funds. <u>Compare with</u> <u>Grove City College v. Bell</u>, 465 U.S. 555, 569-70 (1984) (holding that Grove City College's choice to enroll students who received financial aid grants from the U.S. Department of Education to finance their tuition meant it was an indirect recipient of federal funds).

Importantly, the Board cannot prevent an eligible individual from being reimbursed by the VA, ACCESS-VR or NYSCB because it is not involved in those agencies' decisions of who

---

[1] In <u>NCAA</u>, the Supreme Court was considering whether the NCAA should be subject to Section 901(a) of Title IX of the Education Amendments of 1972. 525 U.S. at 467. However, the Court noted that Section 504 "prohibits discrimination on the basis of disability in substantially the same terms that Title IX uses to prohibit sex discrimination," <u>id</u>., so the Court's analysis applies here.

7

and how much to reimburse. Therefore, if these reimbursements made the Board an indirect recipient of federal funds, the only way it could protect its sovereign immunity would be to prevent anyone potentially eligible for a federally funded reimbursement from taking the bar exam—an absurd result.

### b. The Board is a "Program or Activity" of UCS

Since the Board does not directly or indirectly receive federal funds, it can only be found to have waived its sovereign immunity under the Rehabilitation Act if it is a "program or activity" of a department or agency that itself accepts federal funds—in this case, New York's Unified Court System. In making this determination, the Court must look at how state law defines or characterizes the Board's relationship with UCS. See Regents of the Univ. of California v. Doe, 519 U.S. 425, 429 (1997) (explaining that courts should focus on "the nature of the entity created by state law" in "deciding whether a state instrumentality may invoke the State's immunity."); Hayberger v. Lawrence County Adults Prob. & Parole, 551 F.3d 193, 201 (3d Cir. 2008) (finding the Domestic Relations Section is a "program or activity" of the 53rd Judicial District in Pennsylvania because the state's constitution vests judicial power in a "unified judicial system" that is divided into sixty judicial districts, and state law requires the Court of Common Pleas for every district to have a domestic relations section).

Article VI of the New York State Constitution establishes the judicial branch of the state as the Unified Court System and defines the organization and jurisdiction of the courts. N.Y. Const., art. VI, § 1. It denominates the Chief Judge of the Court of Appeals as "the chief judicial officer of the unified court system," authorizes her to adopt administrative policies for the courts and to appoint a Chief Administrator of the Courts, who is responsible for supervising the day-to-day administration and operation of the trial courts. Id. at § 28. New York's Judiciary Laws

provide that the Court of Appeals is responsible for regulating the admission to the practice of law in the state. Pursuant to these laws, the Court of Appeals is required to "appoint five members of the bar to constitute the state board of law examiners" and to "prescribe rules for a uniform system of examination of candidates to practice as attorneys and counsellors, which shall govern the state board of law examiners in the performance of its duties." See N.Y. Jud. L., §§ 53, 56. The Court of Appeals must set the compensation for the members appointed to the Board and may authorize the Board to appoint or remove its employees, whose compensation is also fixed by the Court of Appeals. Id. at § 461. Additionally, the Court of Appeals must either provide offices for the Board to operate in or authorize the Board to procure offices somewhere else in Albany. Id. Finally, the Board is required to provide an annual report of its receipts and disbursements to the Court of Appeals. Id. at § 462.

The Board argues that it is independent from UCS because the statutory scheme described above governs only the Board's most foundational components, but the Board ultimately manages its operations without any daily control or guidance from the Court of Appeals. Despite conceding that the Board takes advantage of certain of UCS's services and departments, the Board argues such limited connections are administrative in nature, are not funded by any federal dollars and do not involve UCS managing core functions of the board.

Although the Board does not perform court-related functions per se, it is a part of New York's judicial branch by statute and operates as an ancillary agency of the Court of Appeals. It stands in a unique position within that branch given its responsibilities, but it does not function so independently that it should be considered a separate department from the rest of UCS. While the Board's day-to-day operations are managed by an Executive Director who is appointed by the Board's members and the Board has discretion to administer and select the content of the bar

exam, it must rely on UCS and the Court of Appeals to carry out its operations. The Board utilizes the Court of Appeals' human resources department and UCS handles all the payroll, benefits and titles for the Board's employees. When the Board has a job vacancy, it must request permission to fill the vacancy from the Court of Appeals and the position is then posted on UCS's website. The Board collects resumes and conducts interviews, but applicants use a standard UCS job application and those who are hired are sent to UCS's personnel department for processing. The Board also uses UCS's phones, scanners, backup and disaster recovery data services, legal research accounts and test processing department. Finally, the Board's lease agreement for its office space states that the premises may be used for the official business of the Board *or* UCS, and incorporates an appendix labeled "Standard Clauses for UCS Leases."

The legislature clearly intended that the Board would function under the supervision of the Chief Judge and the Court of Appeals. Moreover, the Board relies on many of the resources provided by the Court of Appeals and UCS to operate. Such strong administrative ties usually indicate that an entity is not independent but rather a "program or activity" of a department or agency. Compare Arbogast, 789 F.3d at 1185-86 (holding that the Workers Compensation Division was a "program or activity" of the Kansas Department of Labor because, among other things, the Secretary of Labor appoints the division director and is empowered to fix the director's salary, appoint administrative judges, approve selection of assistant directors and establish policies governing all transactions of business and administration of the divisions within the department) and Hayberger, 551 F.3d at 201 (finding that the Domestic Relations Section was not independent from the Pennsylvania's 53rd Judicial District because, among other things, it referred to itself as the "Domestic Relations Section of the Court of Common Pleas and County Commissioners of Lawrence County" in a contract for funds) with Sharer v. Oregon, 581

10

F.3d 1176, 1178–80 (9th Cir. 2009) (holding that Oregon's Public Defense Services Commission and Judicial Department are separate entities under the Rehabilitation Act because, although they are both part of the judicial branch of the state, the Chief Justice of the Oregon Supreme Court has the power to establish the Judicial Department's budget and staffing levels, and to assign or reassign all court staff, while he is only authorized to appoint the seven members of the Commission and serve as a nonvoting, *ex officio* member) and Brewer v. Wisconsin Bd. of Bar Examiners, 2006 WL 752922, at *4 (E.D. Wis. Mar. 22, 2006), aff'd, 270 F. App'x 418 (7th Cir. 2008) (finding that despite having a unified court system, Wisconsin considers its Board of Bar Examiners, Office of State Courts and Supreme Court to be three separate departments under the Rehabilitation Act because "each have independent control over their staff."). Although in different contexts, other courts have held that the Board is a part of New York's judicial branch and under the supervision and control of the Court of Appeals. See Matter of Pasik v. State Bd. of Law Examiners, 102 A.D.2d 395, 400, 478 N.Y.S.2d 270 (1984) (holding that the Board was exempt from New York's Freedom of Information Laws because "[e]ach component [of the process of admission of attorneys] is a delegated part of the judicial process acting pursuant to the authority of the Court of Appeals in accordance with section 53 of the Judiciary Law, and each performs a judicial function.").

Defendant also attempts to separate the Board from the Court of Appeals and UCS by explaining that the Board's operations are wholly supported by the Attorney Licensing Fund, which draws its funds from the biennial registration fees paid by attorneys and is separate from the federal funds received by UCS. Indeed, the account used to support the Board's operations receives no federal money. However, it is funded as part of an overall budget that is approved every year by New York's Governor and legislature to fund the entire judicial branch. The Board

11

prepares its own budget request, which it submits to the Court of Appeals for approval and which is then submitted to UCS's Division of Financial Management to be combined with the requests from all other units. Importantly, the Board's budget requests do not include funding for staff salaries or benefits because UCS centrally budgets for the salaries and benefits of all its employees, including the Board's. Furthermore, the Board collects fees for the bar exam, which are deposited in its bank account and then swept up monthly by the New York State Comptroller's Office into UCS's general fund, which supports other UCS operations. Thus, even though the money used to support the Board's operations comes from the Attorney Licensing Fund, it must be appropriated for the Board by the legislature as part of UCS's overall budget. Compare with Sharer, 581 F.3d at 1179 (holding that the Judicial Department and the Commission are separate departments because the Commission is financed through the state's "general fund" whereas the Judicial Department is financed through an "operating account" in the state treasury); Brewer, 2006 WL 752922, at *4 (finding that the Board is a distinct entity from the Supreme Court and Office of the Courts because "Wisconsin funds the Court and the Office through separate appropriations [] and does not fund the Board at all[]").

Under state law, the Board is both administered and funded as part of New York's judicial branch, UCS. Despite the fact that the Board is not a direct recipient of federal funds, it operates as a division of a larger entity that voluntarily and knowingly chooses to accept federal funds for some of its programs. Under the plain language of the Rehabilitation Act, UCS's acceptance of federal funds waived its Eleventh Amendment immunity for "all of [its] operations," including the Board. See Doall v. Suffolk Cty. Family Court, 2010 WL 11606060, at *5 (E.D.N.Y. Mar. 23, 2010) (holding that Suffolk County Family Court and King's County

Clerk's Office may be held liable under Section 504 despite not being direct recipients of UCS's federal funds because they "are constituent parts of a system that receives federal funding.").

## CONCLUSION

The Board is not a recipient of federal funds because it no longer accepts federally funded vouchers as payment for candidates' bar exam or attorney registration fees and only benefits economically from federal funds that are used to reimburse individuals for those fees. Nonetheless, under the Rehabilitation Act, the Board is a "program or activity" of New York's judicial branch, UCS, which has waived sovereign immunity for all of its operations by voluntarily accepting federal funds to support some of its activities. Since Plaintiff's claim under Section 504 of the Rehabilitation act is not barred under the Eleventh Amendment, the Court has subject matter jurisdiction to hear the case because there is no risk of violating the Board's "right not to be hauled into court" when it is immune from suit. See Smith v. Reagan, 841 F.2d 28, 30 (2d Cir. 1988). Given that the rights and remedies under Title II of the ADA and the Rehabilitation Act are identical, the Court need not reach the constitutional question of whether Title II is a valid exercise of Congress' authority under Section 5 of the Fourteenth Amendment. Accordingly, Defendant's motion to dismiss is denied.

SO ORDERED.

Dated: Brooklyn, New York
September 18, 2019

s/ Raymond J Dearie
_____
RAYMOND J. DEARIE
United States District Judge