UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
T.W.,

               Plaintiff,                          **MEMORANDUM & ORDER**

          - against -                            16-cv-3029 (RJD) (MMH)

NEW YORK STATE BOARD OF LAW EXAMINERS;
DIANE BOSSE; JOHN J. MCALARY;
BRYAN WILLIAMS; ROBERT MCMILLEN;
E. LEO MILONAS; and MICHAEL COLODNER,

               Defendants.
-------------------------------------------------------- x
DEARIE, District Judge

       Plaintiff T.W. alleges that the New York State Board of Law Examiners ("the Board") discriminated against her in violation of Title II of the Americans with Disabilities Act ("ADA") when it denied her requests for certain accommodations on the New York State bar examination in 2013 and 2014. The Board moves to dismiss T.W.'s Complaint, arguing that the Board is immune from the suit under the Eleventh Amendment. We conclude (i) that the Board is entitled to immunity as an "arm of the state"; (ii) that Congress' attempt to abrogate state immunity from Title II suits for money damages was not constitutionally valid as applied to T.W.'s claim; and (iii) that T.W. cannot maintain her requests for injunctive and declaratory relief under Ex parte Young, 209 U.S. 123 (1908). Defendants' Motion to Dismiss is granted in its entirety.

**PROCEDURAL BACKGROUND**

       T.W. originally brought claims against the Board and its members for disability discrimination under Titles II and III of the ADA, Section 504 of the Rehabilitation Act, and the New York City Human Rights Law. See Compl., ECF No. 1, ¶ 3. She also sought injunctive and declaratory relief against the individual members of the Board. Id. In 2017 we dismissed T.W.'s

Title III and New York City Human Rights Law claims, as well as her damages claims against the individual members of the Board. See ECF No. 32 at 1. Her declaratory and injunctive relief claims against the individual members of the Board remained. See id. at 7 n.1. The Second Circuit subsequently dismissed T.W.'s Rehabilitation Act claim and remanded for proceedings on T.W.'s Title II claims, on which we had deferred ruling. See T.W. v. New York State Bd. of L. Exam'rs, 996 F.3d 87 (2d Cir. 2021). The parties then briefed Defendants' Motion to Dismiss the Title II claim, which the Court now addresses.

## DISCUSSION

### I. Arm of the State

The Eleventh Amendment bars private suits against states and state agencies unless Congress validly abrogates that immunity or the state waives it. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 99 (1984); Kelly v. N.Y. State Unified Ct. Sys., No. 21-1633, 2022 WL 1210665, at *2 (2d Cir. Apr. 25, 2022). Although the Board is not a state agency, it nevertheless qualifies for Eleventh Amendment immunity if it can demonstrate that it is an "arm of the state" rather than an entity independent of the state like a political subdivision or other municipal corporation. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977). The Second Circuit established a six-part "arm of the state" test in Mancuso v. New York State Thruway Authority, 86 F.3d 289 (1994), which asks:

> (1) how the entity is referred to in the documents that created it;
> (2) how the governing members of the entity are appointed;
> (3) how the entity is funded;
> (4) whether the entity's function is traditionally one of local or state government;
> (5) whether the state has a veto power over the entity's actions; and
> (6) whether the entity's obligations are binding upon the state.

Id. at 293. If the six factors point in different directions, courts look to two tiebreaking factors: whether allowing the entity to be sued in federal court would "expose the state treasury

2

to risk" or "threaten the integrity of the [s]tate." Id. Between the two tiebreakers, the impact on the state treasury is the factor entitled to dispositive weight. See Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 48–49 (1994). The Board bears the burden of demonstrating that it qualifies as an arm of the state. Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ., 466 F.3d 232, 237 (2d Cir. 2006).

While we have located no previous Mancuso analysis with respect to the Board, we note that a plethora of legal authorities, including this Court, have suggested or assumed that the Board's relationship to New York's judicial branch (also known as the Unified Court System or "UCS")[1] renders the Board an arm of the state or otherwise immune from suit. In Bartlett v. N.Y. State Board of Law Examiners, 970 F. Supp. 1094 (S.D.N.Y. 1997) then-Judge Sotomayor recognized, "[t]here is no dispute that the Board is a creature of the State." Id. at 1118. In its earlier decision in this case, the Second Circuit characterized the Board as an "arm of the State of New York" which "shares in [New York's sovereign] immunity," without further analysis. T.W., 996 F.3d at 92 (cleaned up). And at an earlier oral argument in this case, I observed that the "Board of Law Examiners is a creature of the Court of Appeals via the Judiciary Act." March 20, 2019 Hearing Transcript at 8:23-4. While these statements strongly suggest that the Board is an arm of the state, for the avoidance of doubt, we analyze the Mancuso factors.

The first Mancuso factor, which asks how the Board is referred to in the documents that created it, weighs in favor of immunity. While nothing in the Judiciary Law, which established the Board, explicitly refers to the Board either as an arm of the state or an independent entity, the

---

[1] The UCS itself is an arm of the state entitled to Eleventh Amendment immunity. Sutter v. Dibello, No. 18-cv-817, 2019 WL 4195303, at *6 (E.D.N.Y. Aug. 12, 2019) ("[T]here is no dispute that UCS is an administrative arm of the State of New York."), report and recommendation adopted, 2019 WL 4193431 (E.D.N.Y. Sept. 4, 2019).

organization of the Board as contemplated by the Judiciary Law suggests that it was envisioned as a subunit of the Court of Appeals, itself entitled to immunity as a state agency. See Richards v. State of N.Y., 597 F. Supp. 692, 693 (E.D.N.Y. 1984). The Judiciary Law authorizes the Court of Appeals to "appoint five members of the bar to constitute the state board of law examiners," N.Y. Jud. L. § 56, and to "prescribe rules providing for a uniform system of examination of candidates to practice as attorneys and counsellors, which shall govern the state board of law examiners in the performance of its duties," N.Y. Jud. L. § 53; see also Matter of Brennan, 243 N.Y.S. 705, 711–12 (N.Y. App. Div. 1930) (noting same). As we concluded in 2019 based on our review of the Judiciary Law and the structure of the Board, the "legislature clearly intended that the Board would function under the supervision of the Chief Judge and the Court of Appeals. . . . Such strong administrative ties usually indicate that an entity is not independent [of a department or agency.]" ECF No. 86 at 10.

Against a similar factual backdrop, the District of Rhode Island concluded that the Rhode Island Board of Law Examiners was an arm of the state by virtue of its connection to the state supreme court. Sinapi v. R.I. Bd. of Bar Exam'rs, No. 15-cv-311, 2016 WL 1562909 (D.R.I. Apr. 15, 2016), aff'd, 910 F.3d 544 (1st Cir. 2018). The court found that the Board's immunity followed from the fact that "the Rhode Island Supreme Court is an arm of the State of Rhode Island and the Board is an administrative arm of the Rhode Island Supreme Court." Id. at *2. The same is true under New York law. The legislature established the Board to serve as a delegated operation of the Court of Appeals, not as an independent entity. We agree with the Board that its legislative mandate and organizational structure indicate that it is an arm of the state.

The second Mancuso factor, the appointment of the Board's members, weighs in favor of immunity because members are appointed by the Court of Appeals, rather than by a source

4

independent of the state. See N.Y. Jud. L. § 56; see also Woods v. Rondout Valley Cent. Sch. Dist. Bd of Educ., 466 F.3d 232, 244 (2d Cir. 2006) (noting that appointment by state officials weighs in favor of immunity).

The third Mancuso factor, funding, also weighs in favor of immunity. T.W. contends that the Board's use of funds from attorney registration fees renders it a self-sufficient entity. T.W. Br. at 20-21. But this assertion belies the nature of the Board's funding. The Board does not collect or control attorney registration fees. These fees are housed within the state treasury as part of the Attorney Licensing Fund ("ALF"), which supports various UCS operations including the Board. T.W. Br. at 20; McAlary Dep., ECF No. 83-9, at 67:22-68:7 ("[A]ll of the [ALF] funds actually lie . . . with the state treasury."). The legislature, not the Board, sets the attorney registration fees that support the ALF and designates the programs supported by the ALF. N.Y. Jud. L. § 468-a(4).[2] The Board, therefore, does not resemble self-funded entities like the Port Authority in Hess or the Thruway Authority in Mancuso, which fund themselves by issuing bonds, tolls, or obtaining private financing. See Hess, 513 U.S. at 36 ("the Port Authority was conceived as a financially independent entity, with funds primarily derived from private investors. Tolls, fees, and investment income account for the Authority's secure financial position") (cleaned up). Unlike those entities, the Board is incapable of "paying its own way." Id. at 49.

The Board is also reliant on the three branches of state government for budgetary appropriations. The Board submits budget requests to the Court of Appeals for inclusion in the overall UCS budget, which is subject to UCS revision. T.W. 2018 Br., ECF No. 83, at 10-11.

---

[2] See also Sponsor Memorandum to SB6500, available at: https://www.nysenate.gov/legislation/bills/2021/s6500 (noting that the legislature has raised the bar examination fee twice and has used the increased revenue for programs of its choice).

5

The UCS budget is then presented to the legislature and governor for approval. See McAlary Dep. at 40:20-42:10; Witting Dep., ECF No. 83-1, at 40:5-43:10; 60:21-61:9. As we concluded in 2019, "[u]nder state law, the Board is both administered and funded as part of New York's judicial branch." ECF No. 86 at 12. These facts do not support T.W.'s depiction of the Board as an independent, self-sufficient entity.[3] Indeed, T.W. noted in an earlier filing that the Board "is not self-funding, [the Board]'s funding is completely dependent on UCS's budget allocations to [the Board]." T.W. 2018 Br. at 9.

The fourth Mancuso factor, whether the Board's function is traditionally one of state government, weighs in favor of immunity because the Board is tasked with statewide regulation of attorney admission. We disagree with T.W.'s contention that the Board "does not perform a central governmental function because it is not a licensing authority" and is essentially a private entity that simply administers a test. T.W. Br. at 21. Even as one of several steps in the attorney licensing process, the administration of the bar examination plays a critical gatekeeping role in the regulation of attorneys within the state. As the Court of Appeals has noted, "no application [for admission to practice law in New York] may be entertained . . . unless the Board of Law Examiners . . . has certified that the applicant has successfully completed the examination process." Matter of Anonymous, 78 N.Y.2d 227, 230 (1991).

The fifth factor, state veto power over the Board, is the only Mancuso factor weighing against immunity. The Board does not dispute that the state lacks veto power over it. In fact, the

---

[3] T.W. also notes that the Board does not rely on taxpayer dollars. T.W. Br. at 20-21. But the fact that the Board does not currently use taxpayer dollars does not preclude it from doing so in the future. A state senate bill forecasting an ALF insolvency, for example, states: "Should the [ALF] actually become insolvent, and unable fully to cover [admission and licensing] costs, the Judiciary will have no option but to use General Fund moneys i.e., state taxpayer dollars - to make up the difference." See Sponsor Memorandum to SB6500.

Board notes that while the Court of Appeals sets overall objectives for the Board, it "does not review the Board's reasonable accommodation decisions or individual grading decisions." Def. Rep., ECF No. 111, at 11. And as we previously concluded, "[t]he Board ultimately manages its operations without any daily control or guidance from the Court of Appeals." ECF No. 86 at 9.

Finally, the sixth factor, the state's responsibility for a judgment against the Board, as well as the dispositive, tie-breaking consideration of impact on the state treasury, both weigh in favor of immunity. The parties agree that the Board would satisfy a monetary judgment against it using ALF funds. See T.W. Br. at 24-26; Def. Rep. at 17. As recited above, the ALF is a state fund housed within the state treasury; the legislature sets registration fees and designates the allocation of ALF proceeds. It therefore stands to reason, as the Board submits, that any judgment against the Board will impact the state treasury.

Moreover, unlike Mancuso and other cases finding against immunity, no statutory provision insulates the state from the Board's debts. Cf. 86 F.3d at 296 (noting New York law "expressly provides that the state shall not be liable for the obligations of public corporations, such as the Thruway Authority"); see also Aguilar v. N.Y. Convention Ctr. Operating Corp., 174 F. Supp. 2d 49, 53 (S.D.N.Y. 2001) (noting that statute governing defendant entity, which "expressly provides that '[t]he obligations of the corporation shall not be debts of the state,'" weighed heavily against immunity). This point represents a critical factor distinguishing the Board from the State Bar of Oregon, which the Ninth Circuit recently concluded was not an arm of the state: a state statute exempts Oregon from any indebtedness incurred by its state bar. See Crowe v. Oregon State Bar, 989 F.3d 714, 731-33 (9th Cir. 2021). No such provision of New

7

York law exists with respect to the Board.[4] Moreover, unlike the Board here, the Oregon State Bar received no appropriations from the legislature and was entirely self-funded through membership dues. Id. at 731. This is a logical distinction given that the Board, unlike the Thruway Authority or the Oregon State Bar, is incapable of independently raising funds to satisfy a debt.

In sum, five of the six Mancuso factors, along with the tiebreaking conclusion that the state is liable for the Board's debts, counsel in favor of immunity. We conclude on this record that T.W.'s suit, "in effect, is against the state and must be so treated." State Highway Comm'n of Wyo. v. Utah Const. Co., 278 U.S. 194, 199 (1929). The Board is entitled to immunity from T.W.'s suit under the Eleventh Amendment.

## II. Abrogation of Immunity

T.W. contends that even as an arm of the state, the Board should be subject to her suit because Title II abrogates state sovereign immunity. See 42 U.S.C. § 12202 ("A State shall not be immune under the Eleventh Amendment . . . for a violation of this chapter."). Congress may lawfully abrogate immunity in certain contexts pursuant to its authority under Section 5 of the Fourteenth Amendment to "enforce, by appropriate legislation, the provisions of [the Fourteenth Amendment]."

---

[4] T.W. equates Section 41 of the New York State Finance Law to these provisions. That law, titled, "Indebtedness not to be contracted without appropriation," provides in relevant part that no state board shall "contract indebtedness on behalf of the state, nor assume to bind the state, in an amount in excess of money appropriated or otherwise lawfully available." N.Y. State Finance L. § 41. Our reading of this statute, and the limited number of cases citing it, leads us to the conclusion that it precludes state boards from *entering into contracts* in excess of appropriated funds but would not make it unlawful for the Board to go into debt. T.W. provides no support for her assertion that this law means that the state would have no obligation to cover the Board's debts and no explanation for how, if it did, the Board would satisfy a debt against it given that the Board has no source of independent funding.

The authority of Congress to enact so-called "prophylactic" measures through Section 5, however, is not absolute. It is generally limited to remedying actual Fourteenth Amendment violations and a "somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text," Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 81 (2000), but that is necessary to "remedy or deter actual violations," Bolmer v. Oliveira, 594 F.3d 134, 146 (2d Cir. 2010). To determine whether Congress has acted within the scope of its Section 5 authority in abrogating immunity, courts require that Congress' abrogation be supported by a history of constitutional violations and a remedy that is congruent and proportional to the documented violations. Coleman v. Ct. of Appeals of Md., 566 U.S. 30, 43 (2012).

The Supreme Court in United States v. Georgia, 546 U.S. 151 (2006) established a three-step process to guide the assessment of whether abrogation under Title II is appropriately tailored to a constitutional violation. Id. at 159. On a claim-by-claim basis, a court must determine: (1) which aspects of the state's alleged misconduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment, if at all; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress' purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid. Id. We thus analyze whether Title II's abrogation of immunity is a constitutional exercise of Section 5 authority as applied to bar examination accommodations. While this appears to be a question of first impression within the Second Circuit, a number of district courts elsewhere have analyzed the issue and determined that Title II abrogation in this context exceeds the scope of Congress' prophylactic authority under Section 5.[5] We now join them.

---

[5] See Kohn v. State Bar of Calif., 497 F. Supp. 3d 526, 538 (N.D. Cal. 2020); Block v. Tex. Bd. of L. Examiners, No. 18-cv-386, 2019 WL 433734, at *3 (W.D. Tex. Feb. 1, 2019); Oliver v. Va.

9

1. <u>Whether the Board's alleged conduct violated Title II</u>

At the first <u>Georgia</u> step we ask whether any aspect of the Board's alleged misconduct constitutes a violation of Title II. See <u>Mary Jo C. v. N.Y. State & Loc. Ret. Sys.</u>, 707 F.3d 144, 152 (2d Cir. 2013) (noting at the first <u>Georgia</u> step that "if a plaintiff cannot state a Title II claim, the court's sovereign immunity inquiry is at an end."); <u>Goonewardena v. New York</u>, 475 F. Supp. 2d 310, 324 (S.D.N.Y. 2007).

To state a claim for Title II discrimination, T.W. must establish (1) that she is a "qualified individual" with a disability; (2) that the Board is subject to the ADA; and (3) that she was denied the opportunity to participate in or benefit from the Board's services, programs, or activities, or was otherwise discriminated against by the Board by reason of her disability. <u>Lipton v. N.Y.U. Coll. of Dentistry</u>, 507 F. App'x 10, 10-11 (2d Cir. 2013). T.W. satisfies this burden. She alleges that she is a qualified individual with a disability, Compl. ¶¶ 6, 76-77, that the Board is subject to the ADA, <u>id.</u> ¶ 78, and the Board discriminated against her on the basis of her disability by denying her the full set of reasonable accommodations she requested on the bar examination, <u>id.</u> ¶¶ 87-89. While the Board may be able to demonstrate that the accommodations it provided to T.W. were reasonable, accepting T.W.'s allegations as true at the motion to dismiss stage, T.W. has plausibly alleged that the Board violated Title II by failing to reasonably accommodate her disability.

2. <u>Whether the Board's alleged Title II violation also violated the Fourteenth Amendment</u>

---

<u>Bd. of Bar Exam'rs</u>, 312 F. Supp. 3d 515 (E.D. Va. 2018); <u>Glueck v. Nat'l Conf. of Bar Exam'rs</u>, No. 17-cv-451, 2017 WL 5147619, at *5 (W.D. Tex. Nov. 3, 2017); <u>Brewer v. Wis. Bd. of Bar Exam'rs</u>, No. 04-c-0694, 2005 WL 8164755, at *6 (E.D. Wis. Oct. 24, 2005); <u>Simmang v. Tex. Bd. of L. Exam'rs</u>, 346 F. Supp. 2d 874, 883 (W.D. Tex. 2004).

Applying rational basis review because disability is not a suspect classification, we find no basis to conclude that the Board's alleged failure to provide certain accommodations to T.W. violated the Fourteenth Amendment. See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 446 (1985). T.W. concedes as much in her opposition brief. See T.W. Br. at 31.

### 3. Whether Congress' abrogation was nevertheless valid

Having found that the Board's alleged conduct violated Title II but not the Fourteenth Amendment, we move to the third step of the Georgia framework to determine whether abrogation in this case can nevertheless be considered a valid exercise of Congress' Section 5 power. This challenge requires us to perform the three-step "congruence and proportionality" inquiry based on City of Boerne v. Flores, 521 U.S. 507 (1997): *first*, we identify the scope of the constitutional right at issue, if any; *second*, we examine whether in enacting Title II Congress identified a history and pattern of unconstitutional discrimination by the states in the relevant context; and *third*, we determine whether the rights and remedies created by Title II are congruent and proportional both to the constitutional rights it purports to enforce, if any, and the record of constitutional violations adduced by Congress, if any. Garrett, 531 U.S. at 365, 368, 372-73.

First, whether framed as the right to bar examination accommodations, or the right to practice law, T.W.'s complaint implicates no constitutional right nor any fundamental right subject to heightened judicial scrutiny. See Block, 2019 WL 433734, at *3 ("This Court's research indicates that every court that has addressed the issue has concluded that the practice of law is not a fundamental right."); Jones v. Bd. of Comm'rs of Ala. State Bar, 737 F.2d 996, 1000 (11th Cir. 1984) (finding no fundamental right to take the bar examination and noting that the Supreme Court "has never held that the right to pursue a particular occupation is a fundamental

11

right"); Smith v. Walsh, 519 F. Supp. 853, 858 (D. Conn. 1981) ("Nor is there any fundamental right to obtain a license to practice a certain profession.").

Cognizant of this caselaw, T.W. attempts instead to analogize her case to Tennessee v. Lane, 541 U.S. 509 (2004), which held that Congress validly abrogated Title II as applied to the right of access to the courts. See T.W. Br. at 37. The other case T.W. relies on, Mosier v. Kentucky, 675 F. Supp. 2d 693 (E.D. Ky. 2009), like Lane, found that state sovereign immunity did not block the suit of a deaf attorney whose fundamental right to court access was infringed when the state denied her a courtroom interpreter, effectively excluding her from judicial proceedings. Id. at 699. But T.W. is situated differently than the petitioners in Lane and Mosier. Those decisions held that abrogation was proper because the use of Section 5 authority was sufficiently tailored to deterring violations of the fundamental right to court access. See Lane 541 U.S. at 522-23 (Title II "seeks to enforce a variety of other basic constitutional guarantees, infringements of which are subject to more searching judicial review . . . these rights include some, like the right of access to the courts at issue in this case, that are protected by the Due Process Clause of the Fourteenth Amendment."). As a bar examination candidate, on the other hand, T.W. was several steps removed from any judicial process and cannot conceivably argue that her failure to receive bar examination accommodations denied her due process. Cf. id. at 514 (noting Plaintiff's allegation that defendants violated her "opportunity to participate in the judicial process."). T.W.'s theory confuses the right to participate in the judicial process with the privilege of practicing law. See Turner v. Nat'l Council of State Bds. of Nursing, Inc., 561 F. App'x 661, 666 (10th Cir. 2014) (finding "no authority to suggest that the alleged right of access to a licensing examination, or to a license itself, is either akin to or a part of the fundamental

right of access to the courts."). Simply put, the constitution does not enshrine a right to participate in judicial proceedings as an attorney. Nothing in Lane or Mosier instructs otherwise.[6]

Moving to the second Boerne question, the lack of a fundamental right is not necessarily fatal to T.W.'s claim if Congress, in enacting Title II, identified a history and pattern of unconstitutional discrimination in the context of professional licensing examinations like the bar examination. In Lane, for example, the Court observed that Congress passed Title II in light of a legislative finding that "many individuals, in many States across the country, were being excluded from courthouses and court proceedings by reason of their disabilities." 541 U.S. at 527.

By contrast, in Oliver v. Virginia Board of Bar Examiners, our sister district court found the legislative record of Title II to be devoid of any finding of a widespread pattern of unconstitutional discrimination in professional licensing generally or the bar exam specifically. 312 F. Supp. 3d 515, 530-531 (E.D. Va. 2018). We agree. In Board of Trustees of the University of Alabama v. Garrett, 531 U.S. 356 (2001), the Court explained that a plaintiff must put forth "legislative findings," more than simply "unexamined, anecdotal accounts," to amount to a history of unconstitutional discrimination. Id. at 370. Yet anecdotes are all T.W. provides. She cites the prepared statement of an attorney with a disability from the ADA congressional record, but the crux of that testimony concerns difficulties in obtaining employment, not in taking the bar examination or in testing generally; reference to the bar examination appears only in a footnote. See T.W. Br. Ex. A, ECF No. 110-1, at 10 n.3. T.W. also cites a newspaper article and

---

[6] T.W.'s submission also alludes to the connection between the bar examination and education, but, as she recognizes, there is no fundamental constitutional right to education. See T.W. Br. at 36; see also Goonewardena, 475 F. Supp. 2d at 325–26 (S.D.N.Y. 2007) ("[T]he right to public education is not a fundamental right.") (citing San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 35 (1973)).

13

several examples of testimony heard by the Congressional Task Force on the Rights and Empowerment of Americans with Disabilities describing individuals "who were not allowed to demonstrate their knowledge on professional examinations." T.W. Br. at 40. Lacking from this record is any *finding* by Congress relating to a history and pattern of discrimination against bar examination takers with disabilities. Cf. Lane, 541 U.S. at 529 (observing that "the conclusion that Congress drew from this body of evidence is set forth in the text of the ADA itself" which prohibits discrimination against individuals in "public services").

      Moving to the third and final Boerne step, I must conclude that Title II does not represent a congruent and proportional response to any constitutional violation adduced by Congress. The bar examination is not open to the public; it is not a public service or program like the right to access court proceedings or voting; it does not affect an individual's "ability to live within the structure of our civil institutions" like education. Plyler v. Doe, 457 U.S. 202, 223 (1982). The Supreme Court has observed that the states' interest in regulating the legal profession within their borders is "particularly strong," and that they "bear[] a special responsibility for maintaining standards among members of the licensed professions." Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 460 (1978). Against this backdrop, and in concert with the lack of a fundamental right or history of discrimination, we cannot conclude that Title II is a valid exercise of Congress' prophylactic authority as applied here. That power is limited to instances in which Congress enforces the substantive guarantees of the Fourteenth Amendment. Lane, 541 U.S. at 518. Unless and until a higher authority extends the scope of the services and programs entitled to heightened constitutional scrutiny to include licensing examinations like the bar examination, T.W.'s Title II claim is too far attenuated from any Fourteenth Amendment violation to warrant a congressional exercise of prophylactic legislation.

As a result of the Board's Eleventh Amendment immunity, T.W.'s Title II claim for monetary damages is dismissed for lack of subject matter jurisdiction.

### III. Injunctive and Declaratory Relief

Finally, T.W. seeks declaratory and injunctive relief pursuant to Ex parte Young, 209 U.S. 123 (1908), which provides a limited exception to Eleventh Amendment immunity for petitioners seeking prospective injunctive or declaratory relief against state officials in their individual capacities. Id. at 157; see also In re Dairy Mart Convenience Stores, Inc., 411 F.3d 367, 371 (2d Cir. 2005). The declaratory relief T.W. seeks — a declaration that the individual Board member defendants violated Title II — is plainly foreclosed by the Ex parte Young doctrine. A declaration that a violation of federal law occurred in the past is entirely retroactive. It does not mandate compliance with federal law *in the future* as required by Ex parte Young. See Papasan v. Allain, 478 U.S. 265, 277–78 (1986) (Ex parte Young requires "a violation of federal law by a state official [that] is ongoing as opposed to cases in which federal law has been violated at one time" in the past). T.W. cannot maintain her action for declaratory relief under Ex parte Young.

T.W.'s desired injunctive relief that would prevent the Board from maintaining or reporting records of her examination results[7] must also be denied. Even if we characterize such relief as prospective under Ex parte Young, the Board's expungement of T.W.'s bar examination failures would not redress any of the harm she alleges. See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992) (constitutional minimum of standing to sue requires that injury be

---

[7] T.W. also seeks an injunction requiring the Board to take "affirmative steps to alleviate the ongoing repercussions of the discriminatory test administration that continue to hamper Plaintiff's search for employment." Compl. ¶ 108. It is not clear from the Complaint what affirmative steps T.W. proposes that Defendants take beyond the expungement of her bar examination failures, so we will consider only the expressly requested remedy.

redressable by a favorable decision). T.W. submits that she faces continuing injury because the record of her bar examination failures has hindered her job search and career prospects. Compl. ¶ 74. But T.W. never alleges that a prospective employer has inquired about her bar examination record much less made a hiring decision based on that record. Instead, she alleges that law firms have learned "that she did not have the opportunity to gain the experience they seek from a 2013 graduate due to the disruptions caused by her bar examination failure." Compl. ¶ 62. The Court cannot rewrite history; expungement will neither alter T.W.'s level of experience nor undo the fact that she did not successfully pass the bar until 2015. Moreover, the injunctive relief T.W. requests would suppress a record that, according to the Board, it is prohibited from disclosing to employers under Section 90(10) of the Judiciary Law. See ECF No. 40 at 26. As a result of this lack of redressability, T.W. lacks standing to pursue her claim for injunctive relief against the individual Board members.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is granted in its entirety and Plaintiff's Complaint is dismissed with prejudice.

SO ORDERED.

Dated: Brooklyn, New York
       July 19, 2022

                                          /s/ Raymond J. Dearie
                                          RAYMOND J. DEARIE
                                          United States District Judge